## Case No. 2,466.

CARSON v. ROBERTSON et al.

[Chase, 475;[1] 2 Am. Law T. Rep. U. S. Cts. 116.]

Circuit Court, D. South Carolina. Aug., 1869.[2]

NECESSARY PARTIES—WHO ARE—OBJECTION FOR WANT OF, WHEN SHOULD BE TAKEN.

1. The objection of the want of parties may be taken at any time in the progress of a cause, even in the appellate court.

2. It will be disregarded whenever taken, if it appears that the parties are not necessary, or if although convenient and under some circumstances necessary, they can not be made without depriving the court of jurisdiction.

3. On the other hand if it appears that no final decree can be made without material prejudice to the interests of parties not before the court, the court will not proceed without them, even though such parties are beyond the reach of its process, or can not be made without ousting the jurisdiction.

4. In applying these rules, however, the courts of the United States are always careful to see, that no citizen of a state, other than that in which the defendants reside, shall invoke their jurisdiction in vain, unless it is obviously impossible to protect the interests of the absent parties in their decrees.

5. They will strain a point in favor of the constitutional right of citizens of the United States to sue the citizens of the other states in the courts of the United States. It is a right too clear and too important to be lightly disregarded.

6. One of a firm of several partners purchased, with the firm funds, land, substantially for the firm, but the conveyance was taken in his name and that of one of the other members in trust, for whatever use those two, or the survivor of them, might declare, and until then to the use of all the partners. These two made a mortgage upon the land, to secure a sum of money to a third. In a suit to vacate the whole transaction by the parties who owned the land before its sale, held, that the partner who had actively managed the affairs, being one of those to whom the conveyance was made, was the only necessary party, the other parties being non-resident.

In August, 1856. W. A. Carson died in South Carolina, leaving a large amount of property, real and personal, in that state. By his will he appointed the defendants, Alexander Robertson and John F. Blacklock, executors thereof, directed them to sell, with small exceptions, all his property as soon as and upon the terms they deemed judicious, to pay his debts out of the proceeds, to divide the balance of the proceeds into three equal parts, and to hold in trust one-third part for his son, William Carson, another third part for his son, James Petigru Carson; and the remaining third part for his widow [Caroline Carson], the complainant, during her life,

---

[1] [Reported by Bradley T. Johnson, Esq., and here reprinted by permission.]

[2] [Reversed in Robertson v. Carson, 19 Wall. (86 U. S.) 94.]

and after her death for his two sons. Both executors qualified; about the beginning of 1857 had sold all the property, paid the debts, divided the proceeds into three equal parts, and became the joint holders in trust of one such part for each of the three said legatees. For William Carson they held a bond of E. N. Ball, the defendant, for nine thousand dollars, and one-third of another bond of E. N. Ball for four thousand dollars; for J. P. Carson, a bond of E. N. Ball for nine thousand dollars, and one-third of the said bond of E. N. Ball for four thousand dollars; for the complainant a bond of E. N. Ball for nine thousand dollars, and one-third of the said bond of E. N. Ball for four thousand dollars. The said bonds, executed to the executors, and amounting in the aggregate to thirty-one thousand dollars, were secured by E. N. Ball's mortgage to the two executors, of Dean Hall plantation, which was the testator's property, and had been sold to E. N. Ball for fifty thousand dollars. These bonds and the mortgage were given to the executors to secure the unpaid portion of the purchase money of Dean Hall. Both executors joined in the conveyance to E. N. Ball. The executors also held for each legatee a joint and several bond of E. N. Ball, and the defendant, W. J. Ball, for eleven thousand dollars, each bond being executed to both executors.

Since the early part of 1861, the complainant has resided in New York, and William Carson in Europe or New York. Mr. Blacklock was in Europe during the whole period of the war. In March, 1863, the defendant, McBurney, entered into a treaty with E. N. Ball for the purchase of Dean Hall for one hundred thousand dollars of Confederate treasury notes, and advanced in his own name, or for those he represented, a certain amount of those notes to E. N. Ball, to enable him to get his said bonds and mortgage satisfied by Robertson. Robertson was the only one of the trustees then in the Confederacy. The complainant and William Carson were beyond the limits of the Confederacy, and had no communication with Robertson after the outbreak of the war. William and James P. Carson were both under age. Mr. Blacklock was abroad, and could not be consulted. Mr. Robertson acceded to the proposition of E. N. Ball, and for an amount of the Confederate notes of the nominal value of the bonds and mortgage, surrendered them, and entered satisfaction on the mortgage. The market value of the mortgage bonds was much greater than their nominal value in Confederate notes. These notes could not have been used at the time by either the complainant or William Carson. E. N. Ball, in pursuance of his treaty, subsequently, viz., in April, 1863, conveyed Dean Hall to McBurney and his nominees. McBurney had notice that the bonds and the mortgage of Dean Hall were in the name of both Robertson and Blacklock, and that they

held them in a fiduciary character. The complainant always repudiated the transaction. When the sons came of age, they did so. Mr. Blacklock also repudiated it.

The bill alleged the insolvency of Robertson and Blacklock, and the fact was not specially denied in their answers: The defendant McBurney set up by way of defense the following state of facts: In March, 1863, after some negotiations looking to that result, E. N. Ball sold said tract and conveyed it to McBurney and A. L. Gillespie. The land was paid for out of the partnership funds, the firm being composed of McBurney, Gillespie, Hyatt, Hazeltine, and McGhan. The land was conveyed to the first two, and to the survivor, and to the heirs and assigns of such survivor forever, but to and for such uses as those two or the survivor of them should appoint by deed, and until such appointment, to the use of the different members of the firm, naming them. On May 31, Hyatt sold his interest in the firm to the other partners, and took their bond for forty thousand dollars for it, and McBurney and Gillespie executed a deed in the nature of a mortgage upon said tract, to secure it, but before this mortgage was executed Hyatt released all his interest in the land to the other partners. At the time this suit was instituted. Hyatt was a citizen of New York; Hazeltine was resident in England; Gillespie, after the filing of the bill, removed to New York to live, and Ball, before filing the bill, was a non-resident, and had become bankrupt.

Magrath & Lowndes, for complainant.—The complainant relied on the following principles:

I. The courts of the United States are exceptionally liberal in dealing with the question of parties. Hallett v. Hallett, 2 Paige, 17; Mallow v. Hinde, 12 Wheat. [25 U. S.]. 19S; Eberly v. Moore, 24 How. [65 U. S.] 158.

II. In pursuance of this policy the courts of the United States hold that where a party not before the court is not an inhabitant of or found within the district where the suit is brought, the court will proceed without such party, unless he is an indispensable party, or one whose rights are necessarily affected by the decree.

The sources of this rule are: 1. The act of 1839. 1 Brightly, 15. 2. The 22d and 2d rules in equity. See Shields v. Barrow, 17 How. [58 U. S.] 149, and cases there collected; Payne v. Hook, 7 Wall. [74 U. S.] 431.

I. Robertson & Blacklock, being co-trustees, the act of Robertson, who alone satisfied the mortgages, and whose act in so doing has been repudiated by Blacklock, did not discharge the mortgages in equity, even if it did at law, and the cestui que trust is in the same position as if no act affecting the mortgage had been done. It is assumed here (what will be shown later in this argument) that when Robertson entered satisfaction up-

on Ball's mortgage, Robertson & Blacklock held the mortgage as trustees. The language of the will of W. A. Carson plainly made them joint-trustees. Whether, at law, the act of Robertson discharged the mortgage, is very doubtful. There is no case in South Carolina sustaining such a discharge. In England the legal title would clearly not have passed. Even since the act of 1791 (5 Stat. 169), there has been so far a legal estate in the mortgagee, that he can recover the land after condition broken against any one but the mortgagor in possession (Mitchell v. Bogan, 11 Rich. Law, 688), and that a release to him of the equity of redemption vests in him the legal title (5 Stat. 311). The act of 1791 is to be construed strictly, and not as destroying any of the incidents of the mortgagee's estate, save those in conflict with the purpose of the act. Such is the spirit of the statute just cited. There is no ground for saying that the method of satisfying mortgages is affected by the act of 1791. The interest of the mortgagee is at least of as high a character as the interest of the holders of a chattel real, in which there is an estate, and of which the title can not pass by the act of one of two or more holders. 2 Kent, Comm. (Ed. 1851) 211, note. But whether or not there was a discharge of Ball's mortgage at law, it was not discharged in equity. Both of the joint-trustees must have concurred in the satisfaction entered. "Where the administration of the trust is vested in co-trustees, they all form, as it were, one collective trustee, and, therefore, must execute the duties of the office in their joint capacity." Lewin, Trusts, 297. "Where stock is standing in the name of the several co-trustees, any one may receive the dividends, though all must join in the sale of the coupons; and where they are co-trustees of lands, any one of them may receive the rents, though all must concur in conveyance." Id. 299. "As a general rule, trustees must all join in any sale, lease, or other disposition of the trust property, and also in receipt for money payable to them in respect of their office." Hill, Trustees, 307. "If a trustee refuses to join, it is not competent for the others to proceed without him, but the administration of the trust devolves upon the court." Lewin, Trusts, 298. "Where an account is opened at a banker's, in the name of two or more trustees, it is in their power to require that the checks should be signed by all or any one or more of their number. In strictness it is the duty of trustees to require that the check should bear the joint signature of all the trustees." Hill, Trustees, 308. "Where there is a trust for sale, the receipt must be signed by all the trustees who have undertaken to act. And where a power is given to trustees to discharge the purchaser from seeing to the application of the purchase money, the receipt must be signed even by a trustee who has parted with the estate by a conveyance to his co-trustee, for a transfer of the estate at law carries not along with it the confidence in equity." Lewin, Trusts, 448. "A trustee who has once acted in or accepted a trust, and has not been properly discharged from it, must join with the other trustees in the receipts to purchasers or other persons requiring a discharge for the payment of trust money. And it is immaterial that he has parted with the possession of the legal estate." Hill, Trustees, 307; Sugd. Vend. 50. "If the court is of the opinion that the trust was joint, then the execution is imperfect, and the court will refuse to enforce it." Mayrant v. Guignard, 3 Strob. Eq. 128. Such being the law, what is the state of facts to which it is to be applied? Robertson and Blacklock were named co-executors and co-trustees by Mr. Carson's will. They joined in the conveyance to Ball. Ball's bond and mortgage were to them jointly. In the absence of Mr. Blacklock in Europe, and in a time of war, when intercourse with Europe was precarious, McBurney and E. M. Ball, ignoring Mr. Blacklock entirely, negotiate with Robertson alone, deliver the consideration of the discharge to him alone, and get only his satisfaction on the mortgage. The right which the cestui que trust has to the benefit of the concurrence of two trustees in any act of such importance to her is ignored. Mr. Blacklock does nothing which amounts to acquiescence in the conduct of his co-trustee, and now, before the court, repudiates the transaction. Under these circumstances, the discharge of the mortgages and bonds is not such as equity will respect. The purchaser took with full notice of the trust and the breach of it, and against him equity will enforce the mortgage, either at the suit of the other trustee (Lewin, Trusts, 317) or of the cestui que trust. It is no answer to say that the bonds were paid, and the security is, therefore, discharged as a legal consequence of payment. There is no payment set up, but simply an exchange for Confederate treasury notes. The power given by Mr. Carson's will to one executor was given in the event that only one qualified. Both Robertson and Blacklock having qualified, no question arises under that clause of the will.

II. The act of Robertson was in other respects in breach of his trust, and the purchaser, who not only had full notice of the trust, but assisted in the breach of it, can not hold the estate against the cestui que trust. It is necessary to determine the relation in which Robertson, or Robertson and Blacklock, stood to the estate, and to apply the rules by which equity measures their conduct in that relation.

1. It is submitted that they were trustees; that as such trustees they possessed no special powers, but only the general powers attaching to trustees; that as such trustees it was a breach of trust in them, or either of

them, to release the mortgages of Ball without payment of the bonds they secured. Robertson and Blacklock were named in the will of W. A. Carson both executors and trustees. What is the rule to determine the capacity in which they were acting at the time in question? "Where the right of receiving a fund as guardian, and the duty of paying it as trustee unite in the same person, the law presumes a performance of the duty, and without further proof a surety of the person as guardian is liable." Gray v. Brown, 1 Rich. Law, 351. "When the right to receive and the duty to pay absolutely concur, there can be no election." Id. 363. "Where an administrator has in his hands the balance of an estate, and is afterwards appointed the guardian of infants entitled to the estate, he will be chargeable as guardian." O'Neall v. Herbert, McMul. Eq. 495. "A debt due by an administrator to his intestate's estate is assets in his hands; and if the administrator of an estate becomes also the administrator of one of the distributees, his liability for the distributive share of the latter in the estate of the former attaches upon his second administration." Schnell v. Schroder, Bailey, Eq. 328. See, also. Taylor v. Deblois [Case No. 13,790]. When a fund is given to a person upon certain trusts and he is appointed executor, as soon as he has severed the legacy from the general assets and appropriated it to the specific purpose, he dismisses the character of executor and assumes that of trustee. Phillipo v. Munnings, 2 Mylne & C. 309; Byrchall v. Bradford, 6 Madd. 13, 235; Ex parte Dover, 5 Sim. 500; Hill, Trustees, 237, 364; Lewin, Trusts, 246.

Robertson and Blacklock had, at the time of the sale to McBurney, and long before, performed all their duties as executors of Mr. Carson's will, and the legal presumption that they had transferred the assets to themselves, as trustees, attached. Mr. Robertson says, in his answer, that towards the close of the year 1856 and the beginning of 1857, the executors sold out the entire estate of W. A. Carson, and paid the debts due by him, and held the balance in trust for the purposes of the will. Again, he states in his answer that they held distinct portions of the balance for the several legatees. Mr. Blacklock confirms this statement. In the ordinary's account, filed with the bill, they name themselves trustees. Those accounts show that the estate had been completely settled. It will be difficult for the defendants to show any purpose for which the estate of the executors should be held to have existed in 1863. The onus of rebutting the presumption of law as to the extinguishment of that estate lies upon the defendant. In all the cases cited, the presumption was upheld against third parties. But it is not necessary to resort in this case to the presumption of law; the testator indicates the event that is to mark the termination of the office of executor; he directs the residue of the purchase money to be divided into three

parts and held in trust. Robertson says the division into three parts had taken place about the beginning of 1857. As such trustees, no special powers were given to them by the will of Mr. Carson, the language of which is, "I order and direct my executors to sell," &c. "I authorize and empower my executors or qualified executor to invest and re-invest," &c. The power of sale was exhausted on the sale to Ball, through which the defendants make their title. Why is the expression "qualified" used in giving the power to the executor, if he was meant to use it in his character of trustee? Robertson and Blacklock being then trustees without special powers, what was their authority? The bond of Ball was a contract to pay money, either as interest or principal, and the trustees had no other power in respect to it but to receive money by way of interest and principal whenever either was due. They could exercise no proprietary power over the bond (Lewin, Trusts, 512), e. g., they could not accept something else than money in accord and satisfaction of it. A court might have given them such authority, but Mr. Robertson did not seek its aid. In the case of trustees for sale, there can be no conveyance without the payment of the money. Id. 431. "A trustee will not be allowed to exercise his legal powers to the prejudice of his cestui que trust, and a release by the trustee without any consideration would, unquestionably, be set aside in equity, although the party released had no notice of the trust. And the case for relief would, of course, be still stronger, if the party released had actual notice of the trust." Hill, Trustees, 503. The Confederate treasury notes delivered to Robertson by Ball were not money, and Ball's act was not payment of the bond. It is not necessary to trouble the court with many authorities on that point. The securities which are the subject of this suit are dated January 8, 1857, and March 2, 1857, and are for the payment of dollars. "It is quite clear that a contract to pay dollars, made between citizens of any state of the Union which maintains its constitutional relations with the national government, is a contract to pay lawful money of the United States, and cannot be modified or explained by parol evidence." Thorington v. Smith, 8 Wall. [75 U. S.] 13. "Prior to February 25, 1862, all contracts for the payment of money, not expressly stipulating otherwise, were, in legal effect and universal understanding, contracts for the payment of coin; and, under the constitution, the parties to such contract are respectively entitled to demand and bound to pay the sum due, according to their terms in coin." Hepburn v. Griswold, Id. 604. See, also, the decisions of the courts of South Carolina since the war that Confederate treasury notes are not money. Austin v. Kinsman, 13 Rich. Eq. 259; Mayer v. Mordecai [1 S. C. (N. S.) 383].

2. But assuming that the powers in respect to investment, given by the will of

Mr. Carson, belonged to Robertson and Blacklock in their character of trustees, they exercised those powers in breach of their trust—first, in calling in Ball's mortgage; second, in exchanging it for Confederate treasury notes. The acceptance of these notes by Robertson, in lieu of money, was, as we have shown, a purely voluntary act, and was, therefore, equivalent to a calling in of the mortgage. Money outstanding upon good mortgage security, an executor is not called upon to realize until it be wanted in the course of administration. Orr v. Newton, 2 Cox. 274; Howe v. Earl of Dartmouth, 7 Ves. 137; 1 White & T. Lead. Cas. Eq. p. 444, note. It is not the duty of trustees to call in money invested on good real security where no risk is apparent. Hill, Trustees, 381; Sadler v. Turner, 8 Ves. 621. It has been decided that even an express power to vary the securities does not authorize changes made without any apparent object or any prospect of benefiting the trust estate. Brice v. Stokes, 11 Ves. 324. Our case of Mayer v. Mordecai [supra], seems to rule the same principle. In these cases, except the last, it was held a breach of trust to receive payment of securities. A fortiori an exchange of one security for another would be bad in like circumstances. It is doubtful whether the trustees had any power in equity to exchange one security for another. The language of the will is. "I authorize and empower my executors, or qualified executor. to invest and re-invest the purchase money of my estate, so as aforesaid to be held in trust by them, in such public or private securities or stocks as they may deem best." The words "invest" and "re-invest," have reference only to money, and the testator here uses them in connection with the word money. He means to authorize his trustees to change money, coming into their hands from time to time during the continuance of their trust, into other kinds of property. But such was not Robertson's act; he did not get the money due upon his security and invest it; if he had, the purchasers of the trust property would not have been made parties to this suit, but in excess of his authority he made an exchange of his security for another. But if the act of Robertson was a breach of trust because premature, and because in excess of his authority, it was likewise such because of the character of the security, viz., Confederate treasury notes, he received in satisfaction of Ball's mortgage. It is proposed to show: a. That discretionary powers of investment by trustees are subject in equity to certain restrictions. b. That on general principles they do not extend to investments in such securities as Confederate treasury notes. c. That the precise point is "res judicata."

(a.) "If there be a trust to invest at discretion on 'some good or sufficient' security, or 'at discretion,' the court will not allow the trustees to exercise any discretion as to the nature of the security, but will decide upon the goodness or sufficiency of the security by its own rules." Hill, Trustees, 495. "A power of sale, or of varying trust securities, though to a certain extent discretionary, must not be exercised in an arbitrary or mischievous manner." Id. A trust to invest, at the trustee's discretion, will not authorize a loan of trust money on personal security. Pocock v. Reddington, 5 Ves. 794. Where trustees are empowered to lend "on such securities as they should approve," they are bound to make inquiries, and exercise a sound discretion whether the securities are of sufficient value. Stretton v. Ashmall, 3 Drew. 10. Where money is to be converted "into government funds or other good securities," neither South sea stock nor bank stock will be good investment. Trafford v. Boehm, 3 Atk. 444. In Spear v. Spear, 9 Rich. Eq. 184, it is said that a more strict rule is applied to trustees by appointment than such as give bond. And in this case, the great rule laid down is to place the property in a state of security. In it the court also intimates what are proper securities. 1. Public; 2. Bonds, secured by liens on real estate; 3. Bonds of third persons, with proper sureties.

(b.) Confederate treasury notes are clearly not within the principle of these cases. By the very terms of the contract of which they are the evidence, their payment depends upon a contingency. The doubtful character of the contracts of an unrecognized government, had been the subject of frequent comment in the courts of England and of this country. Thompson v. Powles, 2 Sim. 194; Taylor v. Barclay, Id. 214; Bire v. Thompson, cited Id. 222; Jones v. Garcia Del Rio, 1 Turn. & R. 297; Gelston v. Hoyt, 3 Wheat. [16 U. S.] 303; Rose v. Himely, 4 Cranch [8 U. S.] 241. The supreme court of the United States, through Chief Justice Chase, described their character accurately in Thorington v. Smith, 8 Wall. [75 U. S.] 11: "As contracts in themselves, except in the contingency of successful revolution, these notes were nullities: for except in that event there could be no payer. They bore this character upon their face, for they were made payable only 'after the ratification of a treaty of peace between the Confederate States and the United States of America.'" In the last case on this subject, the supreme court of this state says: "The bond was secured by a mortgage of real estate, according to the testimony, in May, 1862. When the first payment in Confederate money was accepted, such property was worth, in that currency, about fifty per cent. more than it would have brought in gold before the war, and in May, 1863, it was worth three times as much." Mayer v. Mordecai [supra]. The sale of Dean Hall, to the defendant McBur-

ney, for one hundred thousand dollars in Confederate treasury notes, is itself sufficient proof of the appreciation in the value of the mortgage.

(c.) It has been expressly held that the receipt of Confederate treasury notes, by a trustee, is a breach of trust. See Mayer v. Mordecai [supra]; Fitzsimons v. Fitzsimons [1 S. C. (N. S.) 400]; Sanders v. Rogers [Id. 452]; Dunn v. Dunn [Id. 350].

(3.) It remains to consider the liability of the purchasers in this case from the trustees. We have shown that the trustees committed a breach of trust in parting with the mortgage. It is admitted by the answers that the purchasers had full notice of the trust, and that the defendant McBurney advanced to Elias N. Ball the Confederate treasury notes to enable him, in breach of his trust, to satisfy the mortgage held by the trustees and to convey Dean Hall. "Where a party purchases trust property, knowing it to be such, from the trustee, in violation of the objects of the trust, courts of equity force the trust upon the conscience of the guilty party and compel him to perform it." "An abuse of trust can confer no rights on the party abusing it, or on those who claim in privity with him." 2 Story, Eq. Jur. (Ed. 1861) 487, 489. "The doctrine . . is strictly applicable to every purchaser whose title comes into his hands affected with such notice." Id. 390. "If a purchaser have notice of any claim or incumbrance, his conscience is affected, and a court will then not only refuse to interfere in his favor, but will assist the claimant or incumbrancer in establishing his claims against him: his having given a consideration will not avail him; for, as Lord Hardwicke observes, he throws away his money voluntarily and of his own free will. And it may be laid down as a general rule that a purchaser with notice is bound in equity to the same extent, and in the same manner as the person was of whom he purchased. . . . If he buy with notice of the trust, although for a valuable consideration, he must convey the estate to the uses of the settlement." 3 Sugd. Vend. c. 22, § 2. "If the alienee be a purchaser of the estate (i. e. of an estate subject to a trust) at its full value, then if he take, with notice of the trust, he is (subject to the protection afforded by the statute of limitations) bound to the same extent, and in the same manner as the person of whom he purchased; . . . and the rule applies not only to the case of a trust properly so called, but to purchasers with notice of any equitable incumbrance as of a covenant or agreement affecting the estate or a lien for purchase money. . . . A purchaser without notice, from a purchaser with. is not liable for his own bona fides is a good defense in itself and the mala fides of the vendor ought not to invalidate it." Lewin, Trusts, 725. "A purchaser from a trustee, though for a valuable consideration, will be bound by the trust in the same manner, and to the same extent, as the trustee, if the purchase be made with notice of the trust." Hill, Trustees, 509. "Where a purchaser with notice from a trustee conveys, for valuable consideration, to another person who has no notice of the trust, the estate will not be affected with notice in the hands of the second purchaser." Id. 516. "A purchase for valuable consideration without notice will not be a complete defense in a court of equity, unless the purchaser has clothed himself with the legal estate." Id. 517. See, also, 2 Spence, Eq. Jur. 192. The principles cited from the text-books, are sustained by a mass of authority both in England and in this country. Wigg v. Wigg, 1 Atk. 382; Mead v. Lord Orrery, 3 Atk. 238; Mackreth v. Symmons, 15 Ves. 350; Willoughby v. Willoughby, 1 Term R. 771; Bovey v. Smith, 1 Vern. 149; Daniels v. Davison, 16 Ves. 249. "It is a clearly established principle in equity jurisprudence that whenever the trustee has been guilty of a breach of the trust, and has transferred the property, by sale or otherwise, to any third person, the cestui que trust has the full right to follow such property into the hands of such third person, unless he stands in the predicament of a bona fide purchaser for a valuable consideration without notice. . . . The right or option of the cestui que trust is one which positively and exclusively belongs to him." Oliver v. Pratt, 3 How. [44 U. S.] 333. "Wherever the purchaser is affected with notice of the facts which in law constitute the breach of trust, the sale is void as to him; and a mere general denial of all knowledge of fraud will not avail him if the transaction is such as a court of equity will not sanction." Wormley v. Wormley, 8 Wheat. [21 U. S.] 421. In this case, the equity was enforced against the purchaser from the trustee's vendee; and relief was sought and granted both against the trustee and the purchaser. In the case of Caldwell v. Carrington, 9 Pet. [34 U. S.] 86, the same equity was enforced against purchasers for valuable consideration. In that case, the person from whom the purchase was made, and who committed the breach of trust, was not a party to the suit, "because not an inhabitant of the state" (i. e. where the suit was brought). In Boone v. Chiles, 10 Pet. [35 U. S.] 212, the doctrine is explicitly stated. The rule has been recognized, and constantly enforced by the courts of South Carolina. "One purchasing land, to which another has an equitable title, with notice of the equity, takes subject to the equity, and is bound to convey in like manner as the person from whom he purchased." Massey v. McIlwain, 2 Hill. Eq. 421; James v. Bremar, 2 Desaus. Eq. 560; Moragne v. Du Cercueil, 4 Desaus. Eq. 256; Williams v. Hollingsworth, 1 Strob. Eq. 103; Bush v. Bush, 3 Strob. Eq. 131. A purchaser, for valuable consideration, with notice, will not

be protected. O'Neal v. Cothran, 4 Desaus. Eq. 553; Blake v. Jones, Bailey, Eq. 141. The doctrine is recognized in Cummings v. Coleman, 7 Rich. Eq. 509; in Ellis v. Woods, 9 Rich. Eq. 19; in Fretwell v. Neal (1859) 11 Rich. Eq. 559.

These cases show that the principle has always been enforced by the courts of South Carolina without question. Where the application of the rule was resisted, it was because of the facts of the particular case. As to the wisdom of this acknowledged principle of equity jurisdiction, there can be but one opinion. It is beyond question the most important rule which equity enforces for the protection of cestuis que trustent. Indeed, it may be said that equity could not adequately protect them in the absence of the doctrine. If the trustee's sense of duty, and his personal responsibility, were the sole guarantees which cestuis que trustent possessed for the proper preservation of their property, an equitable estate would be a precarious species of property. It is to protect them at once against the trustee's misconduct, and his inability to make indemnity, that equity has given them a two-fold remedy, viz., against the trustee and against his vendee. Nor is it hard upon the latter that, with full notice of the fact that he is dealing with a trustee, he should be held to take nothing by any act of the latter which is a breach of his duty. Without the rule, to deal with an unworthy trustee would become profitable. This case is a fair illustration of the wisdom of the rule, for, in view of the insolvency of the trustees, the complainant will be deprived of her property, and will be practically without remedy, unless she has it against the purchaser. The principle that a purchaser for value of a non-negotiable chose in action, is affected with equities of which he has no notice, and of which by no amount of care, he could obtain knowledge, is harsh in comparison with that now contended for; yet it is enforced without question. The defendants, McBurney, E. N. Ball and W. J. Ball, claim, through the will of W. A. Carson, and have, therefore, in law, notice of that will and its contents. "The purchaser is supposed to have knowledge of the instrument under which the party with whom he contracts as executor, trustee, or appointee, derives his powers." Story, Eq. Jur. § 400. "If a person should purchase an estate from the owner, knowing it to be in the possession of tenants, he is bound to inquire into the estate which these tenants have, and therefore he is affected with notice of all the facts as to their estates." Taylor v. Stibbert, 2 Ves. Jr. 440; Daniels v. Davison, 16 Ves. 249; Smith v. Low, 1 Atk. 489. Registration of a conveyance, required by law to be registered, is notice to all the world. Story, Eq. Jur. § 403. Wills and executors' accounts are, by law, required to be registered in South Carolina. 11 Stat. 48.

The defendants, McBurney and W. J. Ball, admit by their answers, actual notice of the fact that Robertson and Blacklock were dealing in the character of executors. In respect to W. J. Ball, it is to be observed that he is not in the position of a purchaser for value at all, no consideration having moved from him for the discharge of his bond. He is discharged only if the act of E. N. Ball discharges him, and he can be in no better position than E. N. Ball. It is difficult to suggest any argument against the liability of the latter. The peculiar circumstances of this case strengthens the equity against the purchaser. A state of war existed. The only adult cestui que trust and one of the infant cestuis que trustent were in that part of the United States loyal to the government. The trustee, the purchaser, and an infant cestui que trust were in the Confederacy. One effect of the war was to render intercourse between the trustee and two cestuis que trustent, at least extremely difficult and precarious. It moreover made that intercourse criminal. Chancellor Kent, Griswold v. Waddington, 16 Johns. 483. The Confederate treasury notes were not only useless to the two absent cestuis que trustent, but it was unlawful for them to deal with them at all. The state of the country in which the purchaser resided enhanced, as a trust security, the value of the mortgage, which has, at all times been a favorite security of courts of equity. It is submitted that all these facts were equivalent to an actual, positive notice to the purchaser that the absent cestuis que trustent disproved of the action of the trustee, and affect his conscience in equity. It is hardly matter of doubt that if the complainant's demand were made against a citizen of a state which did not form part of the late Confederacy, and were made in a court of that state, it would be sustained. A purchaser from a trustee in a state not of the Confederacy, making his purchase with Confederate treasury notes, would scarcely be protected. To hold that on the same facts the complainant cannot recover against a citizen of South Carolina, is to establish a strange discrimination in favor of the citizens of states which formed part of the Confederacy.

In Texas v. White [7 Wall. (74 U. S.) 700], the supreme court of the United States held expressly that the laws of the United States were in force throughout the Confederacy during the war. But in Mayer v. Mordecai [supra], lately decided by the supreme court of South Carolina, a very different rule from that contended for was laid down. "Although the trustee is not discharged from liability to account for the three bonds, yet the mortgages as against the original debtors can not be set up as of force. The legal title to the bonds was in them, and with the investment of the proceeds they had no concern. If, according to the ruling in this state, the vendee is not bound to see to the applica-

tion of the purchase money (Lining v. Peyton, 2 Desaus. Eq. 375; Laurens v. Lucas, 6 Rich. Eq. 222), or a mortgagee under the order of the court that the money is appropriated to the purpose for which the mortgage was taken (Spencer v. Bank of the State, Bailey, Eq. 468); much less can a debtor who makes satisfaction to the creditor, in a manner acceptable and agreed by him, in the form of actual payment, be held to such requisition." Mr. Justice Inglis, in Austin v. Kinsman, 13 Rich. Eq. 265, says, "a creditor, though entitled to demand payment in lawful money, may waive his right and accept any substitute he pleases, and his voluntary acceptance of such substitute as payment makes it so." "If the satisfaction of the bonds was the result of a fraud between the creditors and the trustee, or produced by an improper combination, to the prejudice of the cestui que trust, or if the debtor knew of the intended misapplication of the proceeds by the trustee, and, in any way, wrongfully facilitated the accomplishment of that design, the instruments would be set up as existing and binding, but no such proof has been made in this case. On the contrary, as to the two principal bonds, the trustee required the payment. There was no medium of circulation but Confederate currency. But so far from doing so he sought payment in it. There is no testimony showing any willful combination on the part of White, Kerr & Goldsmith, with the trustee, which would justify an interference to hold them responsible for the act for which alone he should respond." The present case can be clearly distinguished from that just cited: First. In the latter case, there was one trustee, and "the legal title was in him." It is, to say the least, extremely doubtful whether in this case the legal title was passed by the act of the single trustee of law. Second. The authorities before cited put beyond a doubt that in equity there was an imperfect release of the mortgage in this case, a fact which does not appear at all in Mayer v. Mordecai, and which is of great importance. Third. In Mayer v. Mordecai the trustee made a demand for payment; in this case he did not. The statement of McBurney is, that he and the mortgagor made a treaty for the purchase of Dean Hall, and made an advance to him of Confederate treasury notes to enable him to satisfy the mortgage. Was this not "a wrongful facilitating," or improper combination in the sense of the ruling in Mayer v. Mordecai. Fourth. So much of the reasoning in Mayer v. Mordecai as is derived from the principle, that in this state the purchaser from a trustee is not bound to see to the proper disposition of the purchase money, has no application to this case. The equity which does bind the purchaser in that respect, is a much harder rule in favor of cestuis que trustent, than the one now under consideration. If there had been payment of money to Robertson, the complainant would have no case. The contention is that there

was no payment. The ruling in Mayer v. Mordecai, that a creditor may accept in satisfaction of his debt something else than money, is not denied. While that proposition is perfectly true at law, the court entirely ignores what it had demonstrated and ruled in the previous part of the opinion, viz., that in equity such acceptance was a breach of trust. There was in that case an actual decree against the trustee for the breach of trust. To say that the purchaser has only to look to the legal title, is to destroy the jurisdiction of equity as between cestuis que trustent and third parties. Under such a ruling, a trustee to sell with consent of a cestui que trust, may without that consent make a good title to a purchaser who has full notice of the limitation of his power. The ruling was moreover entirely unnecessary for the protection of the purchaser from the trustee in that case, inasmuch as it was held that he would not be liable unless there was a fraud on his part or improper combination with the trustee to the prejudice of the cestui que trust. It is difficult to see how the conduct of the purchaser in this case can be held to be other than a fraud in the sense of a court of equity, and an "improper combination" with the trustee "to the prejudice of the cestui que trust," within the language of the rule as laid down in Mayer v. Mordecai. That the court did not apply its own rule in Mayer v. Mordecai, is no reason against its application now. It is obvious that the rule is itself in conflict with the whole current of decisions in the courts of England, of the United States, and of South Carolina, in all of which not the fraud of the purchaser, but his knowledge of the trust has been the ground of relief against him, granted to the injured cestui que trust. In the cases where purchases, for valuable consideration, have been set aside, there could be no question of actual fraud, nor does that question arise in the cases before suggested, where a sale by a trustee to sell with consent is set aside if the sale is made without consent, although the complete legal title passed by the sale. How far, then, is this decision of the state court, denying to a suitor a measure of relief thoroughly recognized in all courts of equity, to bind this court?

The 34th section, Act 1789, provides "that the laws of the several states, except where the constitution, treaties, or statutes of the United States, shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States where they apply." The act of May, 1792 (1 Stat. 92), provides that the modes of proceeding in suits at equity shall be "according to the principles, rules, and usages which belong to courts of equity as contradistinguished from courts of common law." Under these statutes it has been uniformly held, since the establishment of the government, that the courts of the United States administer equity according to the gen-

eral principles of English equity jurisprudence. "As the courts of the Union have a chancery jurisdiction in every state, and the judiciary act confers the same chancery powers on all, and gives the same rule of decision. its jurisdiction must be the same in Massachusetts as in other states." Per Marshall, C. J., U. S. v. Howland, 4 Wheat. [17 U. S.] 116; also, Robinson v. Campbell, 3 Wheat. [16 U. S.] 222. The settled doctrine of this court is, that the remedies in equity are to be administered, not according to the state practice, but according to the practice of courts of equity in the parent country, as contradistinguished from courts of law." Per Story, J., Boyle v. Zacharie, 6 Pet. [31 U. S.] 658; also. Livingston v. Story, 9 Pet. [34 U. S.] 632. "The language of this section (section 34, Act 1789). can not, upon any fair construction, be extended beyond civil cases at common law, as contradistinguished from suits in equity." Per Taney, C. J., U. S. v. Reid, 12 How. [53 U. S.] 363. "This court, and other courts of the United States, had repeatedly decided that the equity jurisdiction of the courts of the United States is independent of the local law of any state, and is the same in nature and extent as the equity jurisdiction of England, from which it is derived." Dodge v. Woolsey, 18 How. [59 U. S.] 347. "The equity jurisdiction of the federal courts is the same in all the courts. . . . It is the same in nature and extent as the jurisdiction of England." Barber v. Barber, 21 How. [62 U. S.] 592. "The equity jurisdiction and remedies conferred by the constitution and statutes of the United States can not be limited or restrained by state legislation, and are uniform throughout the states of the Union. Hence the circuit court, for any district embracing a particular state, will have jurisdiction of an equity proceeding against an administrator (if, according to the received principles of equity, a case for equitable relief is stated), notwithstanding that by a peculiar structure of the state probate system, such a proceeding could not be maintained in any court of the state." [Payne v. Hook] Dec., 1868, 7 Wall. [74 U. S.] 425. "It is very clear that no law of a state can force an alien or a citizen of another state, to forego a remedy which would otherwise exist in equity, under the constitution and laws of the United States." Cropper v. Coburn [Case No. 3,-416]. See, also, Fletcher v. Morey [Id. 4.864]; Gordon v. Hobart [Id. 5,609]; Sawyer v. Oakman [Id. 12,402]. It is to be observed that Mayer v. Mordecai was decided since the filing of the bill in this case, at which time the equity now denied was plainly a part of the equity system in South Carolina. In the case of Livingstone v. Jordan [Id. 8,-415]; tried in this court, June term, 1868, before Chase, Ch. J. and Bryan. J.. the plaintiff was allowed to recover lands held by the defendant, under a conveyance made by the order of the court of equity of the state of South Carolina in 1862. It is submitted that the parties whose non-joinder is here objected are not indispensable.

III. Where the joinder of a party would oust the jurisdiction of the court, a court of the United States would be particularly disposed to construe the rules of practice so as to dispense with such party. West v. Randall [Case No. 17.424]; Shields v. Barrow, supra; Payne v. Hook, supra.

CHASE, Circuit Justice. In this case the only question is as to parties, and we are called upon to meet it at the threshold. The objection of the want of parties may be taken at any time in the progress of a cause, and even in the appellate court. The objection will be disregarded whenever taken, if it appears that the parties are not necessary, or if, although convenient and under some circumstances necessary, they can not be made without depriving the court of jurisdiction. On the other hand, when it appears that no final decree can be made without material prejudice to the interests of parties not before the court; the court will not proceed without them. even though such parties are beyond the reach of its process, or can not be made without ousting the jurisdiction. These are general rules, and they apply to courts of the United States as fully as to the courts of the states. In administering these rules, however, the courts of the United States are always careful to see that no citizen of a state, other than that in which the defendants reside, shall invoke their jurisdiction in vain, unless it is obviously impossible to protect the interest of the absent parties in their decrees. The only question here. is whether there is any such obvious impossibility in this case. It is objected, in the first place, that the partners of the defendant, McBurney, are indispensable parties. But it is plain upon the bill and answer that in all the transactions which form the subject of litigation, Mr. McBurney represented the firm. and we perceive no good reason why he may not be held to represent them in this suit. Most of these partners can come in and become parties to the bill, if they desire to do so. If they do not, it will be because they think their interests already adequately represented.

The court will not regard the absence of parties where interests are competently represented as an obstacle to doing justice by a decree between the parties actually before it.

The other objection is, that Elias N. Ball, though named as a party in the bill. has not been served with process. It is the same objection as the others. namely, want of an indispensable party. This gentleman, it seems, bought the property in litigation of the executors of Wm. A. Carson. He gave his bond. secured by mortgage upon the property, for the purchase money; subsequently, dur-

ing the war, he sold to McBurney, and by arrangement between himself, McBurney, and the executors, McBurney paid the amount due the executors upon the bond in Confederate notes, and they thereupon surrendered the bond and discharged the mortgages. Subsequently, and since the war, Ball, it seems, has gone into bankruptcy. Under these circumstances we do not perceive that Ball is a necessary party. It does not appear that either he or his assignee in bankruptcy have any interests which will be prejudiced by a decree. At all events, as it seems to us, a decree may be made so as to do complete justice between parties before the court, and at the same time protect any rights which he or his assignee may appear to have. We can not regard him, therefore, as a necessary party.

We do not express this opinion without some hesitation, but our best judgment is, that it will receive the highest sanction, should the case go to the supreme court.

Whether this be so or not, it would be a positive wrong in this court to turn from its doors a suitor from another state seeking a remedy against citizens in this state, and thus deny to her a right secured by the constitution, upon a doubtful question in reference to parties. We would follow rather the example of Judge Story, that great light of equity jurisprudence, and strain a point in favor of the constitutional right of citizens of the several states to sue the citizens of other states in the courts of the United States. It is a right too clear and too important to be lightly disregarded.

We shall therefore overrule the objection on account of want of parties, and continue the case for answer. It is no small satisfaction to know that any error we may now fall into will be corrected by a higher court.

[NOTE. Defendant appealed to the supreme court, which reversed the decree of the circuit court, assigning as grounds for such reversal (Mr. Justice Swayne delivering the opinion) that E. N. Ball was a necessary and indispensable party, and should have been brought in, inasmuch as the bill failed to aver his insolvency, or to show any reason why he should not or could not be brought before the court, and also because W. J. Ball, his surety, had objected to his absence, and alleged that he represented the debt to be paid, and therefore was entitled to have him present to assist in maintaining this defense, or, in the event of failure of the defense, to assist in taking an account that the decree might conclusively fix the liability of E. N. to W. J., should the latter be compelled to pay the debt. Furthermore, the court held that as the bill charged fraud and conspiracy, and that E. N. was a party thereto, his vendees were entitled to his aid to make their defense; and the court further assigned as a ground for reversal that Gillespie, as one of the grantees of E. N. Ball, who had not, so far as it appeared, parted with the legal title acquired by him, was an indispensable party to the determination of the case. Robertson v. Carson, 19 Wall. (86 U. S.) 94.]